

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| BEST MEDICAL INTERNATIONAL,<br>INC., et al.,<br><br>       Plaintiffs/<br>       Counter-Defendants,<br><br>v.<br><br>ECKERT & ZIEGLER NUCLITEC GmbH,<br><br>       Defendant/<br>       Counter-Claimant. | Civil Action No. 1:10-cv-617 |

## MEMORANDUM OPINION

This matter comes before the Court on Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaims.

Best Medical International, Inc. ("BMI") is a Virginia corporation with its principal place of business in Virginia. Best Vascular, Inc. ("BVI") is a Delaware corporation with its principal place of business in Georgia. Defendant Eckert & Ziegler Nuclitec GmbH, ("Eckert") formerly known as QSA Global, GmbH, ("QSA") is a German corporation with its principal place of business in Germany. Eckert & Ziegler Strahlenund Medizintechnik AG, the parent corporation of Eckert, acquired all the stock of QSA on January 28, 2009.

1

BMI, BVI (together "Best"), and QSA were parties to a Settlement Agreement dated April 16, 2008 that resolved certain disputes at issue in QSA Global GmbH v. Best Medical International, Inc., No. 1:07CV408, ("first lawsuit") before the United States District Court for the Eastern District of Virginia.

The first lawsuit arose out of disputes over the terms and conditions of a Source Manufacturing Agreement ("SMA") executed on October 14, 1999 between AEAT Technology-QSA, GmbH,[1] and Novoste Corporation, in which AEA Technology-QSA GmbH agreed to develop and build an equipment line for Novoste to manufacture Strontium-90 sources ("Sources") and to assemble the sources into source trains. The Sources were used in Vascular Brachytherapy procedures on patients suffering from narrowing of the coronary arteries. Pursuant to Article 7 of the SMA, QSA had to produce sources and source trains that met specifications set forth in Schedule D of the SMA. The vascular brachytherapy procedure is rarely used anymore. The last delivery of source trains made pursuant to the SMA occurred in November 2004. In April 2005, Novoste canceled the SMA before its projected termination date of September 2006, but continued to make payments for minimum purchases of the product.

---

[1] AEA Technology-QSA, GmbH was the predecessor of QSA.

BMI acquired certain assets and assumed certain liabilities from Novoste Corporation through an asset purchase agreement ("AP Agreement") after the production line was shut down.  In the AP Agreement, BMI acquired ownership of a production line located in AEA Technology-QSA, GmbH's facilities in Braunschweig, Germany and acquired all of Novoste's liabilities pertaining to the SMA.

The SMA required Novoste to compensate AEA Technology-QSA, GmbH for product kept available to meet Novoste's source train orders, removal of the production line and cleanup of the AEA Technology-QSA, GmbH facility, and minimum payments for product during the terms of the SMA.  On April 25, 2007, QSA filed a lawsuit alleging that Best had committed numerous breaches of the SMA.

After a year of litigation, the parties settled the first lawsuit.  The Settlement Agreement obligated Best to purchase source trains in the amount of One Hundred Thousand Euros (€100,000) and obligated QSA to provide Best with Source Trains that met certain specifications.[2]  Best also agreed (1) to

---

[2] "By no later than May 31, 2008, Best shall pay to QSA the amount of One Hundred Thousand Euros (€100,000.00) for the purchase of Source Trains containing 500 Sources, and shall provide to QSA its preference for the size Source Trains . . . to comprise Best's purchase.  QSA will attempt to satisfy Best's preference, subject to available quantities of each size Source Train, but in any event shall deliver to Best Vascular, no later than July 10, 2008, Source Trains containing a minimum of 500 Sources.

decontaminate and decommission the production lines ("D&D Obligation") at its own expense by April 16, 2009, with the possibility of extending the time to perform in exchange for monetary payments, and (2) to post a performance bond in the amount of Two Hundred Thousand Euros (€200,000.00) by May 31, 2008, with QSA listed as the obligee, to guarantee performance of the D&D Obligation.

Best paid One Hundred Thousand Euros (€100,000) to QSA for the Source Trains but alleges that the Source Trains that QSA made available did not meet the specifications set forth in Schedule D of the SMA because they did not meet the specified minimum dose rate.

Best did not post a performance bond by May 31, 2008, but Best obtained a letter of credit that expired on May 31, 2009. Eckert agreed to accept a letter of credit in lieu of a performance bond if Best gave a copy of the final letter of credit to Eckert for approval before it was issued.  Best inserted an expiration date into the letter of credit.  The Settlement Agreement obligates Best to provide Eckert with quarterly reports between April 16, 2008 and April 16, 2009

---

If, for any reason, QSA is unable to deliver Source Trains containing 500 Sources, QSA shall provide Best, at QSA's option, the number of Sources necessary to make up the shortfall or a refund calculated at 200 Euros per Source for each Source short of 500 that is delivered.  For the purpose of this Agreement, Sources and Source Trains shall refer to radioactive Sources and Source Trains manufactured by QSA under the SMA.

describing the status of the D&D Obligation, but Best stopped providing such reports after December 19, 2008.  Best's last quarterly report stated that "at this time it appears that likely no effort will be made to save any of the Production Line for reuse."  Best did not fulfill the D&D Obligation by April 16, 2009.  Instead, Best paid for monthly extensions of time in which to complete the D&D Obligation.  As of August 2009, Best had not completed the D&D Obligation.  Eckert continued to give Best access to its facility and encouraged Best to comply with the D&D Obligation.

Best filed the instant action against Defendant Eckert alleging equitable estoppel, breach of the Settlement Agreement in regard to decommissioning of the production line, and breach of the Settlement Agreement in regard to purchase of the source trains.

Defendant filed a counterclaim alleging that Plaintiffs breached the Settlement Agreement by failing to post the Bond, Plaintiffs breached the Settlement Agreement by failing to perform the D&D Obligation, Plaintiffs fraudulently induced QSA to enter into the Settlement Agreement, and sought declaratory relief stating that Plaintiffs defaulted under the Settlement Agreement, which would enable Defendant to avoid certain responsibilities arising under the Settlement Agreement.

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must demonstrate the absence of any issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). However, the non-movant may not rest merely upon allegations or denials in lieu of setting forth specific facts that demonstrate a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

In Count I of the Amended Complaint, Best alleges that equitable estoppel is appropriate because Eckert misled Best into thinking Best had additional time to complete the D&D Obligation, beyond that contemplated by the language of the Settlement Agreement, when Eckert accepted extension payments and did not require additional extension payments. As a result of the alleged misrepresentations, Best believed that Eckert would allow the decommissioning of the production line in the manner that Best deemed the most cost effective and that would give Best "the most reasonable chance of being able to use its production line once removed from the Braunschweig facilities."

6

Furthermore, Best alleges that it detrimentally relied on the misrepresentations and that it has no adequate remedy at law.

Courts have used equitable estoppel as a remedy to enjoin a party whose action induced reliance by another from unfairly benefiting from the relying party's change in position. Emp'rs Commercial Union Ins. Co. of Am. v. Great Am. Ins. Co., 200 S.E.2d 560, 562 (Va. 1973). However, there is no affirmative cause of action for estoppel under Virginia law. Parker v. Westat, Inc., 301 F. Supp. 2d 537, 544 (E.D. Va. 2004). Virginia courts have stated that equitable estoppel usually operates as a shield rather than a sword, and therefore does not of itself create a new right. Id. (citing Meriweather Mowing Serv. v. St. Anne's-Belfield, Inc., 51 Va. Cir. 517, 519 (Va. Cir. Ct. 2000)).

When equitable estoppel is applicable, a party must show (1) a representation; (2) reasonable reliance on the representation; (3) a change of position; and (4) resulting harm. Waynesboro Vill. LLC v. BMC Props., 496 S.E.2d 64, 68 (Va. 1998). Best has not produced evidence to demonstrate each element of an equitable estoppel claim.

Best argues that it has clearly demonstrated a representation by Eckert through emails between Fritz Hohn, the Managing Director of QSA, and Krishnan Suthanthiran, the President of Best, that demonstrate an agreement that Best was

7

to proceed with the D&D Obligation despite the expiration of the deadline set forth in the Settlement Agreement and the four extensions of time.  While the emails show that the parties were attempting to resolve the D&D Obligation after the deadline expired and negotiating proposed plans, they do not contain any specific representations or complete agreements between the parties.  See Dominick v. Vassar, 367 S.E.2d 487, 489 (Va. 1988) (quoting Maxey v. John Doe, 225 S.E.2d 359, 362 (Va. 1976)) ("Silence or inaction in the absence of a duty to speak does not create . . . estoppel.").  There is insufficient evidence in the record to demonstrate that Eckert made representations that led Best to believe that Best could control the D&D Obligation indefinitely without making more payments or that Best could exercise control over the manner of performance of the D&D Obligation once Eckert assumed responsibility over it.  Because Best has not made the necessary showing on the representation element of any possible equitable estoppel claim, summary judgment must be granted to Defendant on Plaintiffs' equitable estoppel claim.

In Count II of the Amended Complaint, Best asserts that Eckert deprived Best of the right to control the D&D Obligation by "willfully and intentionally" refusing to cooperate with Best, resulting in $8,000,000 in damages that represents the cost to Best of rebuilding the production lines.  The Settlement

8

Agreement only excuses Best's own default in failing to complete the D&D Obligation if a force majeure event occurs or QSA willfully and intentionally fails to cooperate with Best.  The evidence does not reveal any breach of the Settlement Agreement by Eckert through willful and intentional failure to cooperate.

Questions of contract interpretation are questions of law to be decided by the Court.  Just Wood Indus. v. Centex Const. Co., 1999 U.S. App. LEXIS 18729, at *7 (4th Cir. 1999).  When parties enter into a contract that is free from ambiguity or doubt, the agreement furnishes the law that governs them.  Richfood, Inc. v. Jennings, 499 S.E.2d 272, 275 (Va. 1998).  The terms of the Settlement Agreement state that "Agreement shall be construed, interpreted, and administered in accordance with the laws of the Commonwealth of Virginia," thus the Settlement Agreement is governed by Virginia law.

Best has not produced facts that demonstrate that Eckert willfully and intentionally failed to cooperate with Best in its attempts to fulfill the D&D Obligation.  To the contrary, Best submitted emails that show that Eckert attempted to work with Best even after the expiration of the prescribed timeframe to resolve the D&D Obligation.  The Settlement Agreement set forth a timeframe in which Best was to complete the D&D Obligation.  Paragraph three of the Settlement Agreement expressly lists April 16, 2009 as the first deadline by which Best was to

complete the D&D Obligation.  Pursuant to the extension
provision in paragraph 3(e)(i), Best could extend the deadline
to perform up to four times, through August 14, 2009.  Best has
not cited a single instance of willful and intentional failure
to cooperate by Eckert within the original timeframe for
completion of the D&D Obligation.  The two alleged examples of
non-cooperation that Best refers to within the extension period
include Eckert's communication to Best that it did not want
Eberhard Fritz, an agent of Best, in Eckert's facilities because
of an unrelated patent dispute with Mr. Fritz, and its request
that Mr. Fritz sign a confidentiality agreement.  Given the
lawsuit pending between Mr. Fritz and Eckert regarding patent
royalties, Eckert's actions are representative of its desire to
protect its own interests rather than a willful and intentional
failure to cooperate with Best.

     If QSA's willful and intentional failure to cooperate
actually caused Best's failure to complete the D&D Obligation by
April 16, 2009, the Settlement Agreement would excuse Best from
completing the D&D Obligation by April 16, 2009 if (1) Best
provided written notice to QSA of QSA's willful and intentional
failure to cooperate, and (2) QSA did not cure its failure to
cooperate within thirty days of receipt of the written notice.
Best could then have additional time to complete the D&D
Obligation without having to pay a fee for the extra time.  Best

did not provide written notice to QSA of any alleged willful and intentional failure to cooperate before April 16, 2009, thus it did not perfect any potential claim for breach of the Settlement Agreement by Eckert's willful and intentional failure to cooperate. Furthermore, even if such a breach had occurred, the exclusive remedy intended by the parties under the terms of the Settlement Agreement is more time for Best to complete the D&D Obligation without having to make additional payments during the time that Eckert failed to cooperate. See Florida Power & Light Co. v. Westinghouse Elec. Corp., 597 F. Supp. 1456, 1473-74 (E.D. Va. 1984) (finding that damages are not recoverable that were unforeseeable at the time of the contract's making by the party allegedly in breach). Because Best has not demonstrated that Eckert willfully and intentionally failed to cooperate with Best during the time contemplated by the Settlement Agreement, Eckert is entitled to summary judgment on Count II of Plaintiff's Amended Complaint.

In Count III of the Amended Complaint, Best alleges that Eckert breached the Settlement Agreement by failing to provide source trains that met the requisite specifications. The SMA required QSA to maintain a minimum source inventory of 500 Sr-90 sources during the commercial phase of the SMA, but QSA did not have to maintain source trains in stock. To compensate QSA for

manufacturing and maintaining the minimum source inventory,
Novoste had to pay QSA upon termination of the SMA.

     To settle QSA's claim regarding the minimum source
inventory repurchase requirement, the Settlement Agreement
provides that Best shall pay QSA for the purchase of Source
Trains containing 500 Sources and give its preference to QSA
regarding the size of the trains.  QSA would then attempt to
satisfy Best's request subject to availability but would deliver
source trains containing a minimum of 500 sources.  In the
Settlement Agreement, Sources and Source Trains refer to
radioactive Sources and Source Trains manufactured by QSA under
the SMA.  The SMA defines "Source" as encapsulated Sr-90
material produced using the Process which meet the
Specifications.  "Specifications" mean those specifications set
out in Schedule D of the SMA.

     Best never ordered source trains from Eckert, although it
conveyed its preference for 60 mm trains.  Eckert made available
to Best all the 60 mm source trains that it had in stock.
Eckert also offered individual sources to Best, as the
Settlement Agreement enabled it to do.  Nevertheless, Best
refused the individual sources and did not ask for the other
source trains that Eckert had available.

     The Court finds no evidence that Defendant breached the
Settlement Agreement by failing to provide source trains that

met the minimum specifications of the Source Manufacturing Agreement.  The Settlement Agreement provides Defendant with the opportunity to attempt to satisfy the source manufacturing requirements based on availability of their current inventory. Eckert has introduced depositions indicating that it complied with such a requirement.  The Defendant is therefore entitled to summary judgment on Count III of the Plaintiffs' Amended Complaint.

In Count I of Defendant's Counterclaim, Defendant recounts that Best agreed to post a performance bond in the amount of €200,000 by May 31, 2008 with QSA as the obligee.  Best did not post the performance bond by May 31, 2008, but instead obtained a letter of credit, thus Defendant seeks damages for Best's alleged breach of contract by failing to post a bond.

Since Best has not performed under the Settlement Agreement, Eckert has assumed the D&D Obligation.  Because there is no bond, Eckert is using its own funds, rather than initially relying on the contemplated bond, to pay for the D&D Obligation. Eckert claims that it has been damaged by being forced to allot its own funds to pay for the D&D Obligation instead of using funds that Best was to post under the terms of the Settlement Agreement.

To prove a breach of contract action under Virginia law, a party must show (1) a legally enforceable obligation; (2) a

violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach.  Sunrise Continuing Care, LLC v. Wright, 671 S.E.2d 132, 135 (Va. 2009).  If Best had posted a bond, Eckert would have been required to apply the proceeds of the bond to the costs of completing the D&D Obligation, and return any usused proceeds to Best.  Under no possible set of circumstances would Eckert be entitled to the amount of the bond as damages.  Eckert has not pled a theory of damage based on the time value of the money, nor has it produced evidence related to damages pertaining to the time value of the money in discovery.  Eckert has not established that it suffered any damages as a result of Best's provision of a letter of credit in lieu of a bond, thus summary judgment will be granted to Plaintiff on Count I of Defendant's Counterclaim.

      In Count II of Defendant's Counterclaim, the Defendant alleges that Best breached the Settlement Agreement by failing to perform the D&D Obligation.  The undisputed evidence shows that Plaintiff failed to complete the D&D Obligation within the original timeframe contemplated in the Settlement Agreement or the extension period and did default on its D&D obligation, but the arbitration provisions of the contract are still in effect. Arbitration provisions are consistently upheld by the courts. Murray v. United Food & Commercial Food Workers Int'l Union, 289 F.3d 297, 301 (4th Cir. 2002).

The Settlement Agreement provides that:

> In the event that Best does not complete the
> D&D Obligation by April 16, 2009 . . . the
> following shall apply:
> (iii)    QSA  shall   have  the  right  to
> complete   the   D&D   Obligation   using
> commercially   reasonable   efforts.    In
> conducting such D&D Obligation, QSA shall
> have a duty to mitigate its costs.  By no
> later than thirty (30) days after completion
> of the D&D Obligation, QSA shall submit to
> Best a description of the work required to
> complete the D&D Obligation and the costs
> QSA has incurred . . . .  Best shall have
> thirty (30) days after receipt of the QSA
> D&D Obligation Report to evaluate the report
> and to provide a written acceptance or
> dispute of QSA's costs.  Best shall pay any
> amount that it does not dispute to QSA
> within thirty (30) days after it files its
> written acceptance or dispute . . . .  If
> Best and QSA are unable to resolve [any
> dispute over costs], they shall work for a
> period of sixty (60) days to resolve the
> dispute.  If the parties have not resolved
> the dispute within that time, the parties
> shall  submit  the  matter  to  binding
> arbitration before a single arbitrator with
> the  arbitration  being  conducted  by  the
> McCammon   Group,   with   Fairfax   County,
> Virginia   being   the   locale   for   such
> arbitration.  Best shall pay any such
> additional amount above the Undisputed
> Amount ordered by the arbitrator within
> thirty (30) days of the decision of the
> Arbitrator.

Upon completion of the D&D Obligation, Defendant must
present the costs of the cleanup to Plaintiffs, Plaintiffs shall
pay Defendant, and if there is an unresolvable disagreement over
the amount, the parties shall submit the disagreement to
mandatory arbitration.  By its terms, the Settlement Agreement

15

requires Eckert to arbitrate the cost of its performance of the
D&D Obligation.

In Count III of the Counterclaim, Eckert alleges that Best
fraudulently induced QSA into signing the Settlement Agreement.
A party alleging fraud must prove (1) a false representation;
(2) of a material fact; (3) made intentionally and knowingly;
(4) with intent to mislead; (5) inducing reliance by the misled
party; and (6) resulting damage. Albanese v. WCI Cmtys., Inc.,
530 F. Supp. 2d 752, 770 (E.D. Va. 2007). When a promisor makes
a promise with the intent not to perform, the promise
constitutes a misrepresentation of a present fact if the
promisor intended the promisee to act to his detriment.
Colonial Ford Truck Sales v. Schneider, 325 S.E.2d 91, 94 (Va.
1985). Under such circumstances, a party can assert a claim for
fraudulent inducement.

Defendant has pointed to no evidence in the record that
supports a claim of fraudulent inducement by Best. Eckert
claims that Best's fraudulent intent can be shown by Best's
failure to perform its obligations in a timely manner and Best's
belief that it would lose in the prior litigation, but such an
argument is unpersuasive. Best claims that there is no
testimony from any representative of Eckert or QSA that Best
admitted that it would lose in the first lawsuit, and Best has
shown that it did partially perform under the Settlement

16

Agreement, including when Best paid for the source trains,
provided some of the required quarterly reports, and paid for
extension payments. Eckert has not met its burden of showing
Best's fraudulent intent, or more broadly that QSA was
fraudulently induced to enter the Settlement Agreement.
Accordingly, Best is entitled to summary judgment on Count III
of Eckert's Counterclaim.

Because the Court has ruled on all points raised in
Counter-Claimant's prayer for declaratory relief, the Court
denies the declaratory judgment claim as moot.

An appropriate Order shall issue.

_____/s/_____
Claude M. Hilton
United States District Judge

Alexandria, Virginia
September _7_ , 2011

17